UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

PABLO R. MUNOZ,                        :

                   Plaintiff,    :    13 Civ. 1269 (VSB)(HBP)

    -against-                     :    REPORT AND
                                       RECOMMENDATION
CAROLYN W. COLVIN, acting         :
Commissioner of Social Security[1]
                                  :
                   Defendant.     :
----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE VERNON S. BRODERICK, United States

District Judge,


I.   Introduction


          Plaintiff, Pablo Munoz, brings this action pursuant to

section 205(g) of the Social Security Act (the "Act"), 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the

Commissioner of Social Security ("Commissioner"), denying his

application for disability insurance benefits ("DIB") and supple-

mental security income ("SSI") benefits.  Both the Commissioner

_____

          [1]Carolyn W. Colvin, who became the acting Commissioner of
Social Security on February 14, 2013, should be substituted as
the defendant in this action in place of Michael J. Astrue.  See
Fed.R.Civ.P. 25(d).

and plaintiff move for judgment on the pleadings pursuant to
Fed.R.Civ.P. 12(c) (Docket Items 20 & 24).  For the reasons set
forth below, I respectfully recommend that plaintiff's motion for
judgment on the pleadings (Docket Item 24) be granted and that
the matter be remanded pursuant to sentence four of 42 U.S.C. §
405(g) for further proceedings consistent with this report and
recommendation.  I further recommend that the Commissioner's
motion for judgment on the pleadings (Docket Item 20) be denied.

II.  <u>Facts</u>

    A.  <u>Procedural Background</u>

      Plaintiff applied for DIB and SSI benefits on September
16, 2010 (Tr.[2] 115-30).  Plaintiff's application was denied on
December 3, 2010 (Tr. 68-76).  Plaintiff timely requested a
hearing before an Administrative Law Judge ("ALJ"); on November
2, 2011, plaintiff, represented by counsel, testified before ALJ
Curtis Axelsen (Tr. 35-67, 77-82).  On December 2, 2011, the ALJ
Axelsen issued a decision finding that plaintiff was not disabled
(Tr. 21-30).  His decision became the Commissioner's final

---

     [2]"Tr." refers to the administrative record that the
Commissioner filed with its answer, pursuant to 42 U.S.C. §
405(g) (Docket Item 10).

decision on February 1, 2013 when the Appeals Council denied
plaintiff's request for review (Tr. 1-7).

Plaintiff commenced this action on February 25, 2013,
seeking review of the Commissioner's decision (Docket Item 1).
The Commissioner and plaintiff filed their motions on January 23,
2014 and February 20, 2014, respectively (Docket Items 20 & 24).

B.  <u>The Medical Record</u>[3]

Plaintiff alleges that he became disabled on October 1,
2009 due to the following symptoms:  (1) severe back pain, (2)
depression, (3) "massive nerve problems," (4) high blood pres-
sure, (5) impaired vision, (6) memory loss, (7) panic attacks and
(8) sleep apnea (Tr. 143).  At his hearing, plaintiff testified
that he had a mild herniated disc in his lower back (Tr. 50).
Plaintiff stated that he experienced shooting pain in lower left
side of his back on a daily basis; he rated the pain at ten on a
scale of one to ten (Tr. 51-52).  Plaintiff said that he also
experienced muscle spasms and muscle tightness (Tr. 52-53).
Plaintiff testified that he was undergoing treatment from a
physical therapist and a pain management specialist, was taking

---

[3]I recite only those facts relevant to my review.
Plaintiff's medical history is summarized more fully in the
administrative record (Docket Item 9).

3

codeine and receiving injections and had taken Percocet (Tr. 53-54). Plaintiff said that due to his back pain, he could not sit or stand for more than thirty minutes or perform household chores, but was walking one to two miles every day (Tr. 56-57). He also said that his back pain had prevented him from working as a dishwasher and as a janitor (Tr. 45).

At the hearing, plaintiff claimed that had experienced depression, panic attacks, memory loss and low energy (Tr. 60-61). Plaintiff also said that he had difficulty reading, writing and following instructions (Tr. 63-64). Plaintiff also claimed that he had blurry vision in his left eye and could only see "white" from his right eye (Tr. 46-47). Plaintiff said that he underwent gastric bypass surgery in September 2011, which lowered his weight from two-hundred and seventy-nine pounds to one-hundred and eighty-five pounds within a month (Tr. 41-42). He claimed that before the surgery he had experienced severe sleep apnea, which often prevented him from breathing or sleeping (Tr. 49-50). However, plaintiff said he had not experienced these symptoms since he had the surgery (Tr. 49).

The record contains notes from two of plaintiff's hospital visits. On September 9, 2004, plaintiff was admitted to the emergency room of Columbia Presbyterian Medical Center by his sister, who reported that plaintiff was having suicidal ideations

and homicidal ideations toward his wife (Tr. 164).  Dr. Giovanny Nunez examined plaintiff, diagnosed him as suffering from major depressive disorder and antisocial personality disorder and prescribed Paxil and Ativan (Tr. 165).  Plaintiff was discharged on September 15, 2004 (Tr. 165).  On April 1, 2008, plaintiff was admitted to the emergency room at New York Presbyterian Hospital complaining of severe neck pain and spasms in the right side of his neck (Tr. 197-204).  He was diagnosed with cervicalgia[4] and given Percocet, Valium and lidocaine injections (Tr. 200, 203-04).

From January 2010 to September 2010, plaintiff under-went treatment with Dr. Ana Rojas at Heights Physicians Group PC. On January 14, 2010, plaintiff complained that he was experiencing "constant migraines," severe pain and nausea (Tr. 251).  Dr. Rojas diagnosed plaintiff as suffering from lumbago,[5] obesity, cluster headache syndrome and hypertension, requested a magnetic resonance image ("MRI") of his brain and prescribed Verapamil, Imitrex and Medrol (Tr. 251-52).  The MRI was "unremarkable" but showed that plaintiff was suffering from either mild or moderate

---

[4]Cervicalgia is a general term that describes neck pain. Smith v. Colvin, No. 12-CV-5573, 2013 WL 4519782 at *4 n.21 (E.D.N.Y. Aug. 26, 2013).

[5]Lumbago is a "pain in the lumbar region."  Dorland's Illustrated Medical Dictionary, ("Dorland's") at 956 (27th ed. 1988).

sinusitis (Tr. 264-65).  A noted dated February 1, 2010 indicates that plaintiff was no longer experiencing migraines or hypertension-related symptoms (Tr. 249).

On March 3, 2010, Dr. Rajendra Rampersaud conducted a polysomnography[6] that revealed that plaintiff was experiencing oxygen saturation levels as low as 83% with frequent arousals and an Apnea-Hypoapnea Index[7] of 102.7 while he slept (Tr. 205).  Dr. Rampersaud diagnosed plaintiff as suffering from severe obstructive sleep apnea syndrome and recommended that he lose weight and avoid alcohol, sedatives and hypnotics (Tr. 205).  On March 18, 2010, Dr. Rojas concurred with Dr. Rampersaud's diagnosis of obstructive sleep apnea and prescribed plaintiff a continuous positive airway pressure ("C-PAP") machine (Tr. 245).

On July 14, 2010, plaintiff complained to Dr. Rojas that he was experiencing shooting pain in the middle of his back, at times lasting up to one hour, with a severity of ten out of ten (Tr. 243).  Plaintiff said that he visited an emergency room in April and that his prescribed pain killers had not alleviated

_____

[6]A polysomnography is a "[s]imultaneous and continuous monitoring of relevant normal and abnormal physiologic activity during sleep." Stedman's Medical Dictionary, ("Stedman's") at 1425 (27th ed. 2000).

[7]This index refers to the number of episodes of reduced or absent respiratory effort per hour.  Read v. Comm'r of Soc. Sec., Civil Action No. 2:13-cv-86, 2014 WL 1048803 at *4 n.2 (D. Vt. Mar. 14, 2014).

his pain (Tr. 243).  Plaintiff also complained that he was experiencing shortness of breadth, which worsened while he was walking (Tr. 243).  Finally, plaintiff complained that he was feeling depressed (Tr. 243).  Upon physical examination, Dr. Rojas found left-sided paraspinal tenderness and mid-thoracic point tenderness in plaintiff's back (Tr. 244).  Dr. Rojas made additional diagnoses of muscle spasms and major depressive affective disorder of unspecified degree, prescribed plaintiff Citalopram, Ibuprofen and Flexeril and referred plaintiff to a psychiatrist, a bariatric specialist and a physical therapist (Tr. 244).

In August 2010, plaintiff reported that the pain in his back was still a ten out of ten and that he was suffering from shortness of breath, dizziness and heart palpitations (Tr. 241). Plaintiff also reported that he was using the C-PAP machine every night and that he was sleeping better (Tr. 241).  Dr. Rojas discontinued plaintiff's dosage of Citalopram and Flexeril and prescribed plaintiff Robaxin to treat his muscle spasms (Tr. 240, 242).  On September 29, 2010, plaintiff reported that he was taking Vicodin for the pain in his back, and, while the medica-tion did not cure his pain, the severity was now an eight out of ten (Tr. 235).  Dr. Rojas confirmed the diagnoses she made in July 2010 (Tr. 236).

Pursuant to the referral from Dr. Rojas, plaintiff underwent physical therapy from July 14, 2010 to December 31, 2010 (Tr. 223-34, 266-67).  On July 14, 2010, Vincente Calsip, plaintiff's physical therapist, found that plaintiff suffered from several functional limitations, namely, an inability to sit or stand for more than five minutes at a time, walk more than one block continuously or climb more than four steps at a time (Tr. 227).  The notes from plaintiff's sessions during July, August and September disclose that the severity of plaintiff's pain had decreased from an eight or nine out of ten to a six out of ten (Tr. 224-34).  On September 25, 2010, another physical therapist, Siegfred Cruz, found that plaintiff was unable to sit or stand for more than nine minutes at a time, walk more than two blocks continuously or climb more than seven steps (Tr. 223).

Plaintiff also underwent several medical tests.  An MRI of plaintiff's lumbar spine taken on August 26, 2010 revealed a mild left paracentral disc herniation at the L4-L5 level with no arthropathy or spinal stenosis (Tr. 261-62).  An MRI of plain-tiff's thoracic spine taken on September 30, 2010 showed evidence of what could have been a moderate herniated disc at the C5-C6 level accompanied by a mild spinal stenosis (Tr. 263).  An

electromyography[8] of plaintiff's lower back and legs taken on
August 24, 2010 was unremarkable (Tr. 210-13).

On August 30, 2010, plaintiff was examined by Dr.
Maayan Keshet, an ophthalmologist (Tr. 219).  Plaintiff com-
plained that sporadic blurry vision in his right eye and episodes
of complete blindness in his left eye, each lasting several days
(Tr. 219).  Upon examination, Dr. Keshnet found that plaintiff
suffered from myopic[9] degeneration with ten diopters of
anisometropia[10] in his right eye (Tr. 219).  She also found that
plaintiff had visual disturbance in both eyes and recommended
that plaintiff undergo a head scan with an MR angiography[11] (Tr.
219).

From September 2010 through the date of the ALJ's
decision, plaintiff underwent psychiatric treatment with Dr.
Nunez.  On September 15, 2010, Dr. Nunez wrote that he was

---

[8]An electromyography is "a procedure useful for study of
several aspects of neuromuscular function, neuromuscular
conduction, extent of nerve lesion, reflex responses, etc."
Dorland's at 537.

[9]"Pertaining to or affected by myopia; nearsighted."
Dorland's at 1092.

[10]"[A] difference in the refractive power of the two eyes."
Dorland's at 90.

[11]An MR angiography is an "imaging of blood vessels using
special magnetic resonance (MR) sequences that enhance the signal
of flowing blood and suppress that from other tissues."
Stedman's at 320.

treating plaintiff for "major depressive disorder severe recur-
rent" and had prescribed plaintiff Cymbalta and Ambien (Tr. 221).
Plaintiff attended monthly appointments with Dr. Nunez, but the
only other document in the record pertaining to plaintiff's
treatment is a Residual Functional Capacity ("RFC") Questionnaire
for Psychiatric Disorders form completed by Dr. Nunez on June 7,
2010 (Tr. 319-23).  In that form, Dr. Nunez wrote that plaintiff
exhibited decreased motor activity and slow speech (Tr. 320).
She also wrote that plaintiff's affect was dysphoric, his mood
was depressed, his concentration was poor and his intelligence
was average (Tr. 320-21).  Dr. Nunez diagnosed plaintiff as
suffering from major depressive disorder and hypertension (Tr.
321).  Dr. Nunez opined that plaintiff suffered from (1) marked
restriction in activities of daily living, (2) marked difficulty
in maintaining social functioning, (3) marked difficulty in
maintaining concentration, persistence and pace and (4) repeated
episodes of deterioration of extended duration (Tr. 321-22).
Regarding plaintiff's abilities in a work setting, Dr. Nunez
found that plaintiff suffered from marked limitations in his
ability to do the following:  (1) understand, remember, and carry
out instructions, (2) respond appropriately to supervision or to
co-workers, (3) satisfy normal quality, production and attendance

10

standards, (4) respond to customary work pressures and (5)

perform simple or complex tasks on a sustained basis (Tr. 323).

        On November 3, 2010, Dr. Marilee Mescon examined

plaintiff at the SSA's request (Tr. 284-87).  Plaintiff reported

that his parents shopped, cooked and cleaned for him, but that he

could shower, bathe and dress himself (Tr. 285).  Regarding

plaintiff's visual acuity, Dr. Mescon wrote that plaintiff's

vision was 20/70 on a Snellen Chart at twenty feet without

glasses (Tr. 285).  Regarding plaintiff's general appearance,

gait and station, Dr. Mescon wrote:

> The claimant appeared to be in no acute distress.  Gait
> normal.  Can walk on heels and toes without difficulty.
> Squat full.  Stance normal.  Used no assistive devices.
> Needed no help changing for exam or getting on and off
> exam table.  Able to rise from chair without diffi-
> culty.

(Tr. 285).  Under the subheading "musculoskeletal," Dr. Mescon

found:

> Cervical spine shows full flexion, extension, lateral
> flexion bilaterally, and full rotary movement bilater-
> ally.  No scoliosis,[12] kyphosis,[13] or abnormality in
> thoracic spine.  Lumbar spine shows full flexion,
> extension, lateral flexion bilaterally, and full rotary
> movement bilaterally.  [Straight leg raise] negative
> bilaterally.  Full [range of motion] of shoulders,
> elbows, forearms, and wrists bilaterally. [Range of

---

[12]Scoliosis is "[a]bnormal lateral and rotational curvature
of the vertebral column."  Stedman's at 1606.

[13]Kyphosis is an excessive forward curvature of the thoracic
spine.  Stedman's at 955.

> motion] of hips:  [i]nternal rotation of left and right
> hips:  [u]nable.  Full [range of motion] of knees and
> ankles bilaterally.  No evidence subluxations,[14]
> contractures,[15] ankylosis,[16] or thickening.  Joints
> stable and nontender.  No redness, heat, swelling, or
> effusion.

(Tr. 286).  Dr. Mescon diagnosed plaintiff as suffering from

congenital blindness in the right eye, back pain and obesity (Tr.

287).  In the medical source statement, Dr. Mescon concluded that

there were no limitations in plaintiff's ability to sit, stand,

climb or to push, pull or carry heavy objects (Tr. 287).

On November 3, 2010, Dr. Haruyo Fujiwaki, a licensed

psychologist, also examined plaintiff at the SSA's request (Tr.

278-81).  Regarding plaintiff's current functioning, Dr. Fujiwaki

wrote that plaintiff complained of trouble sleeping, "extremely"

depressed mood, feelings of guilt, low energy, irritability,

concentration difficulties and forgetfulness (Tr. 278).  Dr.

Fujiwaki also wrote that plaintiff was paranoid and scared around

others and was hearing voices "like echos" (Tr. 279).  Dr.

---

[14]A subluxation is "[a]n incomplete luxation or dislocation;
though a relationship is altered, contact between joint surfaces
remains." Stedman's at 1716.

[15]A contracture is a "[s]tatic muscle shortening due to
tonic spasm or fibrosis, to loss of muscular balance, the
antagonists being paralyzed or to a loss of motion of the
adjacent joint." Stedman's at 405.

[16]Ankylosis is "[s]tiffening or fixation of a joint as the
result of a disease process, with fibrous or bony union across
the joint." Stedman's at 90.

Fujiwaki wrote that during the examination, plaintiff was respon-
sive, cooperative, appropriately dressed and spoke adequately and
coherently (Tr. 279).  Plaintiff's affect was restricted in range
and his mood was dysthymic (Tr. 279-80).  Plaintiff's attention,
concentration and memory were mildly impaired and his cognitive
functioning was below average (Tr. 280).  Plaintiff told Dr.
Fujiwaki he could dress, bathe and groom himself, but could not
cook, clean, or shop due to back pain (Tr. 280).  Plaintiff
stated that he could take public transportation alone and could
manage his own money (Tr. 280).  Plaintiff also wrote that his
hobbies included playing with his children, listening to music
and watching television (Tr. 280).  Dr. Fujiwaki made the follow-
ing conclusions about plaintiff's vocational capabilities:

> [H]e is able to follow and understand simple directions
> and instructions.  He can perform simple tasks inde-
> pendently.  He has some difficulty maintaining atten-
> tion and concentration.  He is able to maintain a
> regular schedule with some difficulty due to emotional
> distress secondary to back pain.  He can learn new
> tasks with extended time.  He can perform complex tasks
> with some difficulty and needs supervision.  He can
> make some simple decisions.  He may have some diffi-
> culty relating with others and dealing with stress
> appropriately.  Difficulties are caused by physical
> pain.

(Tr. 280-81).  Dr. Fujiwaki diagnosed plaintiff with (1) "Major
depressive disorder NOS," (2) "Anxiety disorder NOS," (3) "Psy-
chotic disorder NOS," (4) high blood pressure, (5) back pain, (6)

sleep apnea and (7) right eye blindness, and recommended that he
continue psychological and psychiatric treatment (Tr. 281).

On November 22, 2010, a state agency psychologist, Dr.
R. Nobel, reviewed plaintiff's medical records and completed a
Psychiatric Review Technique form and a Mental RFC Assessment
(Tr. 289-312).  In the Psychiatric Review Technique form, Dr.
Nobel indicated that plaintiff's mental impairment did not
satisfy the criteria for presumptive disability in sections 12.04
or 12.08 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 497-
508).  Regarding the extent of plaintiff's functional limita-
tions, Dr. Nobel found that plaintiff suffered from (1) mild
restriction in activities of daily living, (2) mild difficulty in
maintaining social functioning, (3) mild difficulty in maintain-
ing concentration, persistence and pace and (4) one or two
repeated extended episodes of deterioration (Tr. 299).  In the
Mental RFC Assessment, Dr. Nobel concluded that plaintiff was
moderately limited in his ability to:  (1) carry out detailed
instructions, (2) maintain attention and concentration for
extended periods, (3) sustain an ordinary routine without special
supervision, (4) complete a normal workday or workweek without
interruptions from psychologically based symptoms and perform at
a consistent pace without an unreasonable number and length of
rest periods, (5) accept instructions and respond appropriately

14

to criticism from supervisors, (6) respond appropriately to changes in the work setting and (7) set realistic goals or make plans independently of others (Tr. 303-04).  Dr. Nobel's conclusions regarding plaintiff's vocational limitations were identical to Dr. Fujiwaki's conclusions (Tr. 305).

III.  <u>Analysis</u>

    A.  Applicable
        <u>Legal Principles</u>

       1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir. 2008).

      The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  <u>Tejada v. Apfel</u>, 167 F.3d 770, 773-74 (2d Cir. 1999); <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987); <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 327-28 (S.D.N.Y.

15

2009) (Marrero, D.J.).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision."  Ellington v. Astrue, supra, 641 F. Supp. 2d at 328; accord Johnson v. Bowen, supra, 817 F.2d at 986.  However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."  Johnson v. Bowen, supra, 817 F.2d at 986.

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417, quoting

Monesur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam).

    2.  Determination
        of Disability

    A claimant is entitled to SSI benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).[17]  The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D), and it must be

            of such severity that [the claimant] is not only unable
            to do his previous work but cannot, considering [the
            claimant's] age, education, and work experience, engage
            in any other kind of substantial gainful work which
            exists in the national economy, regardless of whether
            such work exists in the immediate area in which [the

_____

        [17]The standards that must be met to receive SSI benefits
under Title XVI of the Act are the same as the standards that
must be met in order to receive Disability insurance benefits
under Title II of the Act.  Barnhart v. Thomas, 540 U.S. 20, 24
(2003).  Accordingly, cases addressing the latter are equally
applicable to cases involving the former and vice versa.

claimant] lives, or whether a specific job vacancy
exists for [the claimant], or whether [the claimant]
would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must consider both objective and
subjective factors when assessing a disability claim, including:
(1) objective medical facts and clinical findings; (2) diagnoses
and medical opinions of examining physicians; (3) subjective
evidence of pain and disability to which the claimant and family
or others testify; and (4) the claimant's educational background,
age and work experience. Brown v. Apfel, 174 F.3d 59, 62 (2d
Cir. 1999) (per curiam); DiPalma v. Colvin, 951 F. Supp. 2d 555,
565 (S.D.N.Y. 2013) (Peck, M.J.).

"In evaluating disability claims, the SSA follows a
five-step process mandated by the relevant regulations." Selian
v. Astrue, supra, 708 F.3d at 417.

First, the Commissioner considers whether the claimant
is currently engaged in substantial gainful activity.
If he is not, the Commissioner next considers whether
the claimant has a 'severe impairment' which signifi-
cantly limits his physical or mental ability to do
basic work activities.  If the claimant suffers such an
impairment, the third inquiry is whether, based solely
on medical evidence, the claimant has an impairment
which is listed in Appendix 1 of the regulations.  If
the claimant has such an impairment, the Commissioner
will consider him [per se] disabled . . . .  Assuming
the claimant does not have a listed impairment, the
fourth inquiry is whether, despite the claimant's
severe impairment, he has the residual functional
capacity to perform his past work.  Finally, if the

> claimant is unable to perform his past work, the Com-
> missioner then determines whether there is other work
> which the claimant could perform.

Selian v. Astrue, supra, 708 F.3d at 417-18 (alterations in

original), quoting Talavera v. Astrue, supra, 697 F.3d at 151;

see also 20 C.F.R. §§ 404.1520, 416.920; Barnhart v. Thomas,

supra, 540 U.S. at 24-25; Butts v. Barnhart, 388 F.3d 377, 383

(2d Cir. 2004), amended in part on other grounds on rehearing,

416 F.3d 101 (2d Cir. 2005).

Step four requires that the ALJ make a determination as

to the claimant's RFC to perform work available to him.  See

Genier v. Astrue, supra, 606 F.3d at 49.  RFC is defined in the

applicable regulations as "the most [the claimant] can still do

despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1),

416.945(a)(1).  To determine RFC, the ALJ "identif[ies] the

individual's functional limitations or restrictions and

assess[es] his or her work-related abilities on a func-

tion-by-function basis, including the functions in paragraphs

(b), (c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."

Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per

curiam), quoting Social Security Ruling 96-8p, Titles II and XVI:

Assessing Residual Functional Capacity in Initial Claims ("SSR

96-8p"), 1996 WL 374184 at *1.  The results of this assessment

determine the claimant's ability to perform the exertional

demands of sustained work, and may be categorized as sedentary,
light, medium, heavy, or very heavy.  20 C.F.R. §§ 404.1567,
416.967; see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL
150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

     The claimant bears the initial burden of proving
disability with respect to the first four steps.  Selian v.
Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537
F.3d at 128.  Once the claimant has satisfied this burden, the
burden shifts to the Commissioner to prove the final step -- that
the claimant's RFC allows the claimant to perform some work other
than the claimant's past work.  Selian v. Astrue, supra, 708 F.3d
at 418; Butts v. Barnhart, supra, 388 F.3d at 383.

> In meeting [his] burden of proof on the fifth step of
> the sequential evaluation process described above, the
> Commissioner, under appropriate circumstances, may rely
> on the medical-vocational guidelines contained in 20
> C.F.R. Part 404, Subpart P, App. 2, commonly referred
> to as "the Grid."  The Grid takes into account the
> claimant's RFC in conjunction with the claimant's age,
> education and work experience.  Based on these factors,
> the Grid indicates whether the claimant can engage in
> any other substantial gainful work which exists in the
> national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl,
D.J.).  When a claimant retains the RFC to perform at least one
of the categories of work listed on the Grid, and when the
claimant's educational background and other characteristics are
also captured by the Grid, the ALJ may rely exclusively on the

Grid in order to determine whether the claimant retains the RFC to perform some work other than his or her past work.  Butts v. Barnhart, supra, 388 F.3d at 383 ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the [Grid]).") (internal quotation marks and citation omitted).

However, "exclusive reliance on the [Grid] is inappropriate" where nonexertional limitations "significantly diminish [a claimant's] ability to work."  Butts v. Barnhart, supra, 388 F.3d at 383 (internal quotation omitted); Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986).  When a claimant suffers from a nonexertional limitation such that he is "unable to perform the full range of employment indicated by the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid fails "to describe the full extent of [the] claimant's physical limitations," Butts v. Barnhart, supra, 388 F.3d at 383, the Commissioner must introduce the testimony of a vocational expert in order to prove "that jobs exist in the economy which the claimant can obtain and perform."  Butts v. Barnhart, supra, 388 F.3d at 383 (internal quotation marks and citation omitted); see 20 C.F.R. §§ 404.1569a(d), 416.969a(d), Pt. 404, Subpt. P, App. 2, § 200.00(e); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the

21

regulations make clear that the individual's particular limita-
tions must be considered.").

    3.  <u>Treating Physician Rule</u>

       When considering the evidence in the record, the ALJ
must give deference to the opinions of a claimant's treating
physicians.  Under the "treating physician rule," a treating
physician's opinion will be given controlling weight if it is
"well-supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in . . . [the] record."  20 C.F.R.
§§ 404.1527(d)(2), 416.927(d)(2);[18] <u>Burgess v. Astrue</u>, <u>supra</u>, 537
F.3d at 127-28; <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir.
2004) (<u>per curiam</u>); <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir.
2002).

       Before an ALJ gives a treating physician's opinion less
than controlling weight, however, he or she must apply various
factors to determine the amount of weight the opinion should be

---

[18]Effective March 26, 2012, Sections 404.1527(d) and
416.927(d) was re-codified as 404.1527(c) and 416.927(c),
respectively, but without substantive changes.  <u>See</u> <u>How We</u>
<u>Collect & Consider Evidence of Disability</u>, 72 Fed. Reg. 10,651,
10,657 (Feb. 23, 2012).  However, because other provisions of the
regulations were substantively amended, I apply the version of
the regulations in effect when the ALJ rendered his decision.
<u>Lowry v. Astrue</u>, 474 F. App'x 801, 804 n.2 (2d Cir. 2012).

given.  These factors include:  (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6); Halloran v. Barnhart, supra, 362 F.3d at 32; Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993). "[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Halloran v. Barnhart, supra, 362 F.3d at 32-33; Schisler v. Sullivan, supra, 3 F.3d at 567.

B.  The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements for DIB through March 31, 2014 (Tr. 23).  The ALJ then applied the five-step analysis for DIB and SSI benefits described above (Tr. 23-30).

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since October 1, 2009 (Tr. 23).

23

As step two, the ALJ determined that plaintiff's suffered from the following severe conditions:  (1) congenital blindness in his right eye, (2) paracentral disc herniation of the lower back and (3) depression (Tr. 23).

At step three, the ALJ concluded that plaintiff's mental impairments, either singly or in combination, did not meet or medically equal the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Tr. 23).  The ALJ determined that plaintiff did not satisfy the criteria set forth in listing 1.04 and listing 2.00 (Tr. 23).

The ALJ also determined that plaintiff did not satisfy the criteria set forth in paragraphs B or C of listing 12.04 (Tr. 24).  Regarding the paragraph B criteria, the ALJ found that plaintiff suffered from mild restrictions in activities of daily living, mild difficulties in social functioning, moderate difficulties regarding concentration, persistence and pace, and that plaintiff had not experienced more than one to two episodes of decompensation of extended duration (Tr. 25).

The ALJ then made an RFC assessment.  After summarizing plaintiff's testimony regarding his impairments, the ALJ determined that plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms.  However, the ALJ found that plaintiff's statements as to the intensity,

24

persistence and limiting effects of his symptoms were not credi-
ble to the extent they were inconsistent with plaintiff's RFC
(Tr. 26).

      The ALJ also considered the opinion evidence.  He gave
great weight to Dr. Mescon's opinion that plaintiff had no
limitations on his ability to sit, stand, climb, push, pull or
carry heavy objects (Tr. 27).  The ALJ found that Dr. Mescon's
opinion was supported by diagnostic evidence, a nerve conduction
study, and plaintiff's own testimony (Tr. 27).  The ALJ gave less
than controlling weight to the opinion of Dr. Nunez that (1)
plaintiff had marked limitations in activities of daily living
and social functioning, (2) frequently experienced deficiencies
in concentration, persistence, and pace and (3) experienced
repeated episodes of deterioration or decompensation in work or a
work-like setting (Tr. 27).  He also gave less than controlling
weight to Dr. Nunez's opinion that plaintiff was markedly limited
in his ability to perform the following functions in a work or
work-like setting on a regular and continuous basis:  (1) under-
stand, remember and carry out instructions, (2) respond appropri-
ately to supervision, (3) respond appropriately to co-workers,
(4) satisfy an employer's normal quality, production and atten-
dance standards, (5) respond to customary work pressures, (6)
perform complex tasks in full-time work setting and (7) perform

25

simple tasks in a full-time work setting (Tr. 27). The ALJ stated that Nunez's opinion was inconsistent with the opinion of Dr. Fujiwaki, a consulting physician, and was "not well supported by the medical evidence" (Tr. 27-28). Finally he gave great weight to the opinion of Dr. Fujiwaki that plaintiff (1) could follow and understand simple directions and instructions, perform tasks independently, make some simple decisions, perform complex tasks with supervision, (2) had some difficulty relating to others and dealing with stress and (3) had some difficulty maintaining attention and concentration and maintaining a regular schedule because he found that Dr. Fujiwaki's opinion was consistent with the record (Tr. 29).

The ALJ then summarized the medical evidence regarding plaintiff's sleep apnea and the blindness in his right eye and found that neither condition limited his ability to work (Tr. 28-29). From this evidence the ALJ concluded that plaintiff retained the RFC to perform light work with the additional limitations that plaintiff could only perform simple two- and three-step tasks and could not work around machinery (Tr. 25).

At step four, the ALJ determined that plaintiff's mental limitations might preclude his past work as a gas station attendant (Tr. 29).

At step five, the ALJ concluded that plaintiff's non-exertional limitations did not significantly affect his ability to work (Tr. 30).  Accordingly, in light of plaintiff's age, education, work experience and RFC, the ALJ applied Medical Vocational Rule 202.18, 20 C.F.R. Pt. 404, Subpt. P, app. 2 and concluded that plaintiff was not disabled (Tr. 30).

C.  Analysis of the
    ALJ's Decision

Plaintiff advances three arguments in support of his contention that the ALJ's decision should be reversed.  First, he claims that the ALJ violated the treating physician rule (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings, (Docket Item 25) ("Pl.'s Mem.") at 14-24).  Second, he claims that the ALJ erred in evaluating plaintiff's credibility (Pl.'s Mem. at 28-30).  Lastly, he claims that the ALJ improperly failed to call a vocational expert to assess plaintiff's significant, nonexertional limitations (Pl.'s Mem. at 24-28).

1.  The ALJ's Compliance with
    the Treating Physician Rule

Plaintiff first claims that the ALJ violated the treating physician rule with respect to Dr. Nunez.

On June 7, 2010, Dr. Nunez diagnosed plaintiff as suffering from major depressive disorder and found that plaintiff suffered from (1) marked restriction in activities of daily living, (2) marked difficulty in maintaining social functioning, (3) marked difficulty in maintaining concentration, persistence and pace and (4) repeated episodes of deterioration of extended duration (Tr. 321-22).  He also found that plaintiff suffered from marked limitations in his ability to (1) understand, remember, and carry out instructions, (2) respond appropriately to supervision or to co-workers, (3) satisfy normal quality, production and attendance standards, (4) respond to customary work pressures and (5) perform simple or complex tasks on a sustained basis in a full-time work setting (Tr. 323).

After summarizing these findings, the ALJ found that Dr. Nunez's opinion was not entitled to controlling weight because it was "not well supported by the objective medical evidence and is inconsistent with the opinion of Haruyo Fujiwaki . . . ." (Tr. 28).  He did not specify what objective medical evidence was lacking, what objective medical evidence, if any, contradicted Dr. Nunez's opinion or why he found that Dr. Fujiwaki's opinion was more credible.  The ALJ appears to have relied on certain conclusions he made regarding Dr. Nunez's

28

report at step three.  At step three, with respect to plaintiff's daily activities, the ALJ wrote:

> Dr. Fujiwaki's report notes that the claimant reported that he was able to dress, bathe and groom himself and that he was able to take public transportation and manage money.  According to the report, the claimant did not cook, clean, do laundry, and food shopping due to back pain and that his mother did most of the chores.  His daily activities were noted to include listening to music, watching television, listening to the radio and playing with his children.  Although the claimant reported that [he] does not perform household chores, there is no indication that this is due to his depression.  The undersigned notes that the claimant's activities, as noted above are inconsistent with the opinion of Giovanny Nunez, M.D., his treating psychiatrist, that the claimant is markedly limited in activities of daily living . . .

(Tr. 24).  Regarding plaintiff's social functioning, the ALJ wrote:

> Although Dr. Nunez opines that the claimant is markedly limited in social functioning . . ., this is not well supported by the objective medical evidence.  The undersigned notes that the claimant testified that he participated in a program for public assistance, and although he discussed his difficulty sitting in the classroom for eight to nine hours during this program, he did not indicate that he had any emotional problems during his participation in the program.

(Tr. 24).  Regarding plaintiff's difficulties resulting from deficiencies in concentration, persistence and pace, the ALJ simply wrote that "[a]lthough the claimant's treating psychiatrist reports that the claimant has marked difficulty maintaining

concentration, persistence or pace, the objective evidence fails
to support this opinion" (Tr. 24).

          The ALJ's analysis violates the treating physician rule
in several respects.  First, the ALJ did not specify the weight
given to Dr. Nunez's opinion, instead offering only that he did
"not give [it] controlling weight" (Tr. 29).  It is, thus,
impossible to determine what weight -- if any --  the ALJ elected
to give Dr. Nunez's opinion.  This is especially troubling,
because even when a physician's opinion is not controlling, it is
at least entitled to some weight.  See Hidalgo v. Colvin, 12 Civ.
9009 (LTS)(SN), 2014 WL 2884018 at *20 (S.D.N.Y. June 25, 2014)
(Swain, D.J.) (adopting Report & Recommendation); Pierre v.
Astrue, No. 09-CV-1864 (JG), 2010 WL 92921 at *9 (E.D.N.Y. Jan.
6, 2010) (noting that the ALJ "failed . . . to mention the weight
[that the treating physicians'] opinions were given (except to
say it was not 'great')"); see also Social Security Ruling 96-2p,
Titles II & XVI:  Giving Controlling Weight to Treating Source
Medical Opinions, 1996 WL 374188 at *1, *4 ("Treating source
medical opinions are still entitled to deference . . . .
[and][i]n many cases, [the opinion] will be entitled to the
greatest weight and should be adopted, even if it does not meet
the test for controlling weight."); Ellington v. Astrue, supra,
641 F. Supp. 2d at 330 ("The regulations are clear that a treat-

30

ing physician's opinion should not be completely rejected if that opinion is found to be non-controlling.").

Second, it was improper for the ALJ to fault Dr. Nunez's opinion because it was not supported by the objective medical evidence without first taking steps to develop the record. Admittedly, the degree to which an opinion is supported by other evidence is a factor the ALJ must consider in weighing any opinion. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) ("Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the Commissioner] will give the opinion."). In this Circuit, however, where, as here, the ALJ finds a treating physician's opinion lacking in support, he or she must seek additional information from the treating physician <u>sua</u> <u>sponte</u> before rejecting his or her opinion. <u>See</u> <u>Schaal v. Apfel</u>, 134 F.3d 496, 505 (2d Cir. 1998); <u>accord</u> <u>Waters v. Astrue</u>, No. 5:10-CV-110, 2011 WL 1884002 at *9 (D. Vt. May 17, 2011) ("In circumstances where an ALJ finds an inconsistency in the opinions of a treating physician or finds a treating physician's opinion not supported by objective medical evidence, the ALJ is required to re-contact the physician for clarification."); <u>Calzada v. Astrue</u>, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (Sullivan, D.J.) (adopting Report and Recommendation) ("[I]f a

physician's finding in a report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion."); Rosado v. Barnhart, 290 F. Supp. 2d 431, 440 (S.D.N.Y. 2003) (Marrero, D.J.) ("The ALJ cannot rely on the absence of evidence, and is thus under an affirmative duty to fill any gaps in the record." (emphasis in original)); Cleveland v. Apfel, 99 F. Supp. 2d 374, 380 (S.D.N.Y. 2000) (Scheindlin, D.J.).  There is no indication that the ALJ made the necessary attempts to contact Dr. Nunez before rejecting his opinion.  Had he made attempts to contact Dr. Nunez or to obtain any of Dr. Nunez's treatment notes -- none of which are in the record -- he might have found that there was objective support for Dr. Nunez's opinion and that it deserved controlling weight.

Finally, the ALJ erred by failing to explain in sufficient detail the other reason for rejecting Dr. Nunez's opinion. After summarizing the opinion evidence, the ALJ stated that Dr. Nunez's opinion was not controlling in part because it was inconsistent with Dr. Fujiwaki's opinion.  However, the ALJ failed to state why he credited Dr. Fujiwaki's conclusions over those of Dr. Nunez and without a fuller explanation, it is

32

impossible to determine whether the ALJ relied on legitimate reasons for doing so and whether his reasons were supported by substantial evidence.  Because "good reasons" must be given and comprehensively explained before assigning the opinion of a claimant's treating physician less than controlling weight, the ALJ's failure to explain his reasoning constitutes legal error. See Box v. Colvin, --- F. Supp. 2d ---, ---, No. 12-CV-1317 (ADS), 2014 WL 997553 at *16 (E.D.N.Y. Mar. 14, 2014); Bunn v. Colvin, No. 11-CIV-6150 (NGG), 2013 WL 4039372 at *7 (E.D.N.Y. Aug. 7, 2013) (holding that the ALJ erred when he failed "explain why he found the opinion of Dr. Wade -- who examined Bunn only one time . . . more convincing than the opinion of Dr. Leggett," who was plaintiff's treating physician); Sutherland v. Barnhart, 322 F. Supp. 2d 282, 291 (E.D.N.Y. 2004).

Accordingly, I find that the ALJ erred when he failed to specify the amount of weight he assigned Dr. Nunez's opinion, failed to re-contact Dr. Nunez and failed to explain why he found that Dr. Fujiwaki's opinion was more credible.  On remand, the ALJ should explicitly indicate the weight given to Dr. Nunez's opinion, and, if it is not controlling weight, specifically address the factors set forth in 20 C.F.R. §§ 404.1527(d), 416.927(d).  To the extent the ALJ finds Dr. Nunez's opinion is

not well supported by the objective medical evidence, he is obligated to make diligent efforts to develop the record.

2.   The ALJ's
     Credibility
     <u>Determination</u>

Plaintiff next claims that the ALJ erred when he found that plaintiff's statements regarding the severity, persistence and limiting effects of his symptoms were not credible because (1) the ALJ ignored plaintiff's testimony about the severity of his sleep apnea and (2) the ALJ improperly relied on the absence of certain evidence to discredit plaintiff's testimony about the severity of his depression and anxiety (Pl.'s Mem. at 28-30).

> When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; <u>see McLaughlin v. Sec'y of Health, Educ. & Welfare</u>, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.  <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979).

> The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations.  At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an impairment, at the second

step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.  Id.  The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).

It is "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology." Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995) (Leisure, D.J.); accord Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984); Evans v. Astrue, 783 F. Supp. 2d 698, 710-11 (S.D.N.Y. 2011) (Gorenstein, M.J.); see Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984); Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). "Accordingly, where the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, [the

35

Court] must defer to his findings." Calabrese v. Astrue, 358 F.
App'x 274, 277 (2d Cir. 2009), citing Aponte v. Sec'y, Dep't of
Health & Human Servs., supra, 728 F.2d at 591; Gates v. Astrue,
338 F. App'x 46, 48 (2d Cir. 2009).

     Here, after the ALJ summarized plaintiff's statements
regarding his back pain, depression, anxiety and sleep apnea he
determined that plaintiff's "statements concerning the intensity,
persistence and limiting effects of [his alleged] symptoms are
not credible to the extent they are inconsistent with the . . .
residual functional capacity" (Tr. 26). The ALJ then went on to
discuss many of the factors relevant to the credibility of
plaintiff's statements regarding back pain (Tr. 26-27; see also
20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)). The ALJ did not
conduct the same assessment regarding plaintiff's statements
about the intensity, persistence and limiting effects of his
symptoms related to sleep apnea, depression and anxiety. How-
ever, with respect to plaintiff's sleep apnea, the ALJ wrote that
the "[p]rimary care records indicate that the claimant's obstruc-
tive sleep apnea improves with treatment with CPAP" (Tr. 28).
Regarding plaintiff's symptoms of depression and anxiety, the ALJ
wrote that "[t]he claimant did not testify that he had any
problems emotionally handling his participation in a program for
public assistance and although he claims problems with memory,

there is no evidence of this in his recall of information at the hearing" (Tr. 28).

Although the ALJ did not address all of the relevant factors in assessing plaintiff's statements regarding his sleep apnea, substantial evidence supports his conclusion that plaintiff's statements were not credible.  The ALJ specifically noted that plaintiff stated to his treating physician August 2010 that he was "sleeping much better" when he was using the C-PAP machine on a nightly basis (Tr. 28).  He also noted that when plaintiff's C-PAP machine was broken for a period of twelve months, he was able to function without it (Tr. 26).  Each of these record-based observations were supported by substantial evidence in the record (Tr. 48, 241), and, therefore, should be upheld.

The ALJ did err, however, in dismissing plaintiff's statements about his depression and anxiety.  The ALJ first found that plaintiff did not have emotional problems by relying on the absence of testimony that plaintiff had difficulty meeting the emotional demands of a public assistance program.  The more appropriate inference is that the ALJ failed to develop the record with respect to this point; the ALJ did not ask plaintiff whether his participation in the program required interaction with others or whether it triggered panic attacks, anxiety, anger or other symptoms.  In addition, the fact that plaintiff could

37

handle the emotional demands of the public assistance program, where he sat in a room for eight hours editing his résumé often without any interpersonal interaction, does not tend to show that plaintiff could work in a setting requiring daily interactions with co-workers or supervisors (see Tr. 57).  There is also no substantial evidence to support the ALJ's own observation regarding plaintiff's memory.  The ALJ is not a medical professional and his personal observations, therefore, are entitled to only limited weight.  Schaal v. Apfel, supra, 134 F.3d at 502; quoting Carroll v. Sec'y of Health & Human Servs., supra, 705 F.2d at 643.  The ALJ's observation was, moreover, contrary to the opinion of Dr. Nunez, who found that plaintiff's ability to remember instructions was markedly limited, and the opinion of Dr. Fujiwaki, who found that plaintiff's recent and remote memory skills were mildly impaired (Tr. 280, 323).  In light of this substantial contrary evidence, it was improper for him to discount plaintiff's statements about his memory based on his personal observation alone.

Because neither of the purported inconsistencies cited by the ALJ were supported by substantial evidence, the ALJ's adverse credibility determination is also unsupported.  See Tavarez v. Barnhart, 124 F. App'x 48, 51 (2d Cir. 2008).  On remand, the ALJ should evaluate plaintiff's statements regarding

the intensity, persistence and limiting effects of plaintiff's depression according to the factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### 3. The Need for a Vocational Expert

Finally, plaintiff claims that the ALJ should have called a vocational expert because he was suffering from several significant, nonexertional limitations (Pl.'s Mem. at 24-28).

As indicated above, "the ALJ cannot rely on the Grids if a non-exertional impairment[19] has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert." Selian v. Astrue, supra, 708 F.3d at 421. "A nonexertional impairment is non-negligible 'when it . . . so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" Selian v. Astrue, supra, 708 F.3d at 421, quoting Zabala v. Astrue, 595 F.3d 402, 411 (2d Cir. 2010). To determine whether a claimant's mental impairments, such as

---

[19]Non-exertional limitations or restrictions are those that affect the claimant's ability to perform work related functions and include, among other things, "difficulty functioning because [the claimant is] nervous, anxious, or depressed," "difficulty maintaining attention or concentrating" and "difficulty understanding or remembering detailed instructions." See 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

plaintiff's depression and anxiety, is non-negligible, the ALJ
must consider whether the plaintiff cannot perform any of the
basic mental demands of unskilled work.  Accord Selian v. Astrue,
supra, 708 F.3d at 422; Zabala v. Astrue, supra, 595 F.3d at 411;
Snipe v. Astrue, 873 F. Supp. 2d 471, 481 (N.D.N.Y. 2012); Social
Security Ruling 85-15, Titles II & XVI:  Capability to Do Other
Work -- The Medical-Vocational Rules as a Framework for Evaluat-
ing Solely Nonexertional Impairments, 1985 WL 56857 at *4 ("Where
a person's only impairment is mental, is not of listing severity,
but does prevent the person from meeting the mental demands of
past relevant work and prevents the transferability of acquired
work skills, the final consideration is whether the person can be
expected to perform unskilled work.").  The basic mental demands
of unskilled work include the abilities to (1) understand, carry
out, and remember simple instructions, (2) respond appropriately
to supervision, coworkers, and usual work situations and (3) deal
with changes in a routine work setting, the loss of any of which
would severely limit the number of jobs the claimant could
obtain.  SSR 85-15, 1985 WL 56857 at *4.

     The ALJ found that plaintiff suffered from several
unspecified nonexertional limitations that had "little or no
effect" on the number of unskilled positions available to him
(Tr. 30).  The ALJ stated that he considered the basic mental

demands required to perform competitive, remunerative unskilled work listed in SSR 85-15 and found that plaintiff could meet them (Tr. 30).  Consequently, the ALJ found that plaintiff had the ability to perform the exertional demands of light work, and that, given his age, education and work experience, a finding of "not disabled" was warranted under Vocational Rule 202.18 (Tr. 30).

The ALJ's analysis at step five is dependent on his RFC assessment.  Because the ALJ's RFC assessment is flawed and must be revisited on remand for the reasons explained above, his analysis at step five will likely require review on remand as well.  I note, however, that the ALJ's failure to explain his reasoning at step five is problematic for two reasons.  First, the ALJ nowhere defines what plaintiff's non-exertional limitations are, which makes it impossible for the reviewing court to determine whether they are significant.  In addition, the opinion evidence on which the ALJ relies in the RFC assessment demonstrates that plaintiff had at least moderate difficulties meeting the basic mental demands of unskilled work.  For instance, the ALJ did not address Dr. Fujiwaki's opinion that plaintiff had "some difficulty maintaining attention and concentration" and "maintain[ing] a regular schedule" or that plaintiff may have had "some difficulty relating with others and dealing with stress

appropriately" (Tr. 28).  Nor did he address Dr. Nobel's findings
that plaintiff was moderately limited in his ability sustain an
ordinary routine without special supervision, complete a normal
workday or workweek without interruptions from psychologically
based symptoms, accept instructions and respond appropriately to
criticism from supervisors and respond appropriately to changes
in the work setting (Tr. 303-04).  On remand, the ALJ should
consider these opinions and the opinion of Dr. Nunez that plain-
tiff was suffering from significant, nonexertional impairments
(if he assigns Dr. Nunez's opinion any weight) before making a
decision whether to call a vocational expert.

IV.  <u>Conclusion</u>

            Accordingly, for all the foregoing reasons, I respect-
fully recommend that plaintiff's motion for judgment on the
pleadings (Docket Item 24) be granted and that the matter be
remanded pursuant to sentence four of 42 U.S.C. § 405(g) for
further proceedings consistent with this report and recommenda-
tion.  I further recommend the Commissioner's motion for judgment
on the pleadings (Docket Item 20) be denied.

V.  <u>Objections</u>

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  <u>See also</u> Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Vernon S. Broderick, United States District Judge, 40 Centre Street, Room 415, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Broderick.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.  <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair</u>

<u>Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy v. Manson</u>, 714

F.2d 234, 237-38 (2d Cir. 1983) (<u>per</u> <u>curiam</u>).

Dated:   New York, New York
         July 21, 2014

                              Respectfully submitted,


                              HENRY PITMAN
                              United States Magistrate Judge


Copies transmitted to:

James M. Baker, Esq.
Northern Manhattan Improvement
     Corporation
76 Wadsworth Avenue
New York, New York  10033

Vernon Norwood, Esq.
Special Assistant United
     States Attorney
Room 3902
26 Federal Plaza
New York, New York  10278